UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JEFF SEIPEL and TOM VEVEA, as Trustees of the Minnesota Laborers Health and Welfare Fund and Minnesota Laborers Pension Fund; JAMES BRADY and KEITH KRAMER, as Trustees of the Minnesota Laborers Vacation Fund; TOM VEVEA and GARY REED, as Trustees of the Construction Laborers' Education, Training, and Apprenticeship Fund of Minnesota and North Dakota; and RONALD THORNBURG and CINDY ECKLUND, as Trustees of the Minnesota Laborers Employers Cooperation and Education Trust; and each of their successors, | Case No. 07-CV-3864 (PJS/RLE) ORDER |
| Plaintiffs, | |
| v. | |
| ARROWHEAD INDUSTRIAL SERVICE, INC., and CONSTRUCTION SERVICES, INC., OF DULUTH, | |
| Defendants. | |

Pamela Hodges Nissen and Courtney Dacosta, ANDERSON, HELGEN, DAVIS & NISSEN, LLC, for plaintiffs.

R. Thomas Torgerson, HANFT FRIDE, PA, for defendant Arrowhead Industrial Service, Inc.

Joseph J. Roby, Jr., and Jessica L. Durbin, JOHNSON, KILLEN & SEILER, PA, for defendant Construction Services, Inc., of Duluth.

Defendant Arrowhead Industrial Service, Inc. ("Arrowhead") entered into two successive collective-bargaining agreements (collectively "CBA") with the Laborers' District Council of Minnesota and North Dakota ("Union"). The CBA required Arrowhead to make monthly

contributions to a collection of fringe-benefit funds (collectively the "Funds") maintained for the benefit of Union members. The amounts of the payments due under the CBA varied month to month, depending on the amount of time that Arrowhead employees devoted to work covered by the CBA. The CBA required Arrowhead to make contributions for all covered work done by its employees — whether or not the work was done by employees who were Union members — and empowered the Funds to audit Arrowhead's records to ensure that Arrowhead was fulfilling its commitment.

The Funds began to suspect that Arrowhead employees were performing covered work for which Arrowhead was not making the required contributions and sought to audit Arrowhead's records for the period from January 2003 to the present. When Arrowhead refused to give the Funds access to the records, the Funds brought this lawsuit against Arrowhead under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. ERISA requires employers to remit benefit contributions as required by the applicable CBA, *see* ERISA § 515, 29 U.S.C. § 1145, and to maintain records of its contributions, *see* ERISA § 209, 29 U.S.C. § 1059.

During the course of discovery, the Funds learned that Arrowhead had evaded its contribution obligations under the CBA by having its employees do covered work while nominally in the employ of other entities that were controlled by or acting in concert with Arrowhead. Chief among those other entities was Construction Services, Inc., of Duluth ("CSI"), which the Funds added as a second defendant to this lawsuit on the grounds that, although nominally a separate company, CSI was actually an alter ego of Arrowhead. In other words, the Funds alleged that Arrowhead and CSI were one in the same, and that regardless of whether

covered work was done by nominal employees of Arrowhead or nominal employees of CSI, Arrowhead was obligated to make contributions related to that work.

The Funds discovered additional arrangements between CSI and two other companies — arrangements that, according to the Funds, further disguised the fact that Arrowhead employees were doing covered work for which Arrowhead was required to remit contributions. The first such arrangement was with MWM Constructors ("MWM"), a payroll company created by CSI's management to obtain more favorable workers-compensation insurance rates for CSI employees. CSI purported to transfer its employees to MWM in early 2007. After this purported transfer, CSI "leased" back the same employees from MWM, and deemed the leased employees to be "subcontractors."

A second arrangement existed with Apex Mechanical ("Apex"), an independent company that worked with CSI on a large construction project. The government contract for that job — which involved work on London Road in Duluth — required all services to be performed by Apex, so CSI transferred its "subcontractors" to Apex's payroll for purposes of that project. The Funds contend that those employees were in fact employees (not subcontractors) of CSI (not Apex) doing work that was covered by the CBA (because CSI was an alter ego of Arrowhead). In support of their contention, the Funds point to evidence that CSI (not Apex) covered the payroll costs of these individuals and directed their work on the project.

In addition to these arrangements with other companies, the Funds allege that CSI also hid covered work by falsely categorizing some of its own employees as subcontractors. The Funds argue that this practice predated MWM's formation, *see* Beckwith Dep. at 100-102, but that it continued even after the point at which CSI purported to have transferred all its employees

to MWM. The Funds point to CSI's profit-and-loss sheet for 2007, which reflects $1,124,383.72 in payments made during that year to individuals CSI classified as "Subcontractors (Employees) — Other," as distinct from payments made to "subcontractors" from Arrowhead, MWM, and Apex, each of which CSI breaks out separately. Tr. Ex. P-41 at 752. The Funds claim that all of these arrangements functioned to circumvent Arrowhead's obligation to make fringe-benefit contributions.

Based on records produced by Arrowhead and CSI during discovery, the Funds' auditor prepared an audit invoice for the period from 2003 through 2008 (the "Audit Period"). The auditor identified a total of $349,958.66 in unpaid contributions during the Audit Period. Affidavit of Rodney Skoog [Docket No. 90].

Days before trial, both Arrowhead and CSI withdrew their answers [Docket Nos. 80 and 79 respectively], and the Funds moved for a default judgment [Docket No. 86], asking that Arrowhead and CSI be held jointly and severally liable for a total of $644,038.04.

## FINDINGS

The Court has reviewed the record and finds that the Funds are entitled to a default judgment. The summons and complaint were served on Arrowhead on September 5, 2007. Docket No. 2. After the Funds sought permission to file an amended complaint adding CSI as a defendant, the amended complaint was filed on March 24, 2008, and served on Arrowhead electronically. Docket No. 25. The original summons, the original complaint, an amended summons, and the amended complaint were all served on CSI through the Minnesota Secretary of State on April 24, 2008. Docket No. 27. After the defendants withdrew their answers [Docket

Nos. 79 and 80], the clerk entered the defendants' default under Fed. R. Civ. P. 55(a) [Docket No. 85]. The Funds served the default-judgment papers on Arrowhead and CSI. Docket No. 92.

The Funds have amply documented their entitlement to the relief they seek. The evidence supports the Funds' claim that CSI is an alter ego of Arrowhead. The Eighth Circuit has held that corporate-law principles should be used to assess alter ego liability under ERISA. *See Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997). Under these principles, the Court must inquire as to whether the putative alter ego is (1) controlled by another such that the two are independent in form only; and (2) used to defeat public convenience, justify wrong, or perpetrate fraud. *Id.*

Arrowhead and CSI functioned as a single entity. Dale Cich, founder and sole owner of Arrowhead, is also the de facto principal of CSI. Cich has hiring and firing authority for CSI, and general contractors dealt primarily with him for labor and billing matters. Anderson Dep. at 25; Noble Dep. at 7, 32; Fredericks Dep. at 5, 11. CSI accounted for loans from Cich to CSI as loans from an "officer" or "shareholder." Tr. Ex. P-45 at 802; Licari Dep. at 37-38, 64. Though Cich claims to be a project manager for CSI, he takes cash payments resembling a draw from CSI, and his salary is one-tenth that of CSI's other (real) project managers. Beckwith Dep. at 98; Cich Dep. at 8-9. CSI and Arrowhead shared a bookkeeper, Beckwith Dep. at 8, 41; employees, Tr. Ex. P-7 at 39-41; Tr. Ex. P-8 at 52-53; Tr. Ex. P-9 at 55-56; equipment, Tr. Ex. P-8 at 52; Perrault Dep. at 40; and office space, Beckwith Dep. at 9. There is no record of CSI having billed Arrowhead for its use of these shared resources. *See* Tr. Ex. P-8 at 52; Beckwith Dep. at 15.

This joint arrangement allowed Cich the benefit of the CBA without having to pay its full costs. When bidding for union-only work, Cich could bid as Arrowhead, a union shop. But when bidding for other work, Cich could bid as CSI, a nonunion shop. Because CSI is merely an alter ego of Arrowhead, *all* work — whether nominally done by Arrowhead or nominally done by CSI — was done by individuals who were, in reality, employees of Arrowhead, and thus Arrowhead owed contributions for all work covered by the CBA. Because they are alter egos functioning as a single entity, Arrowhead and CSI are jointly and severally liable for unpaid contributions due under the CBA for work done by Arrowhead, by CSI, or by both.

The evidence further supports the Funds' claim that CSI and MWM are alter egos. Cich effectively runs MWM, just as he runs Arrowhead and CSI. McKinnon Dep. at 6. CSI has identified no employee-leasing agreements between the two companies. Perrault Dep. at 26. MWM does not charge CSI a markup for supplying workers; instead, CSI transfers to MWM only enough money to cover its "leased" employees' wages, taxes, and insurance — no more. Beckwith Dep. at 19. MWM's employees are all former CSI employees, and are still identified as CSI employees by clients and by the workers themselves. Fredericks Dep. at 16-18; LeDoux Dep. at 12. In response to the Funds' discovery requests to *CSI*, CSI produced *MWM* timecards and Minnesota Department of Labor correspondence addressed to MWM. *See, e.g.*, Tr. Ex. P-4; Tr. Ex. P-190 at 8074, 8077, 8108-09; Beckwith Dep. at 25. Adhering to the fiction that CSI and MWM are separate entities would allow CSI — and, by extension, Arrowhead — to avoid making the fringe-benefit contributions that Arrowhead is required to make under the CBA for covered work performed by Arrowhead/CSI/MWM employees. Because MWM is an alter ego

of CSI, and CSI is an alter ego of Arrowhead, Arrowhead and CSI are jointly and severally liable for unpaid contributions related to covered work performed by nominal MWM employees.

Arrowhead and CSI may also be held jointly liable for unpaid contributions related to work that either performed as part of a joint venture. Section 515 of ERISA provides that where a CBA obligates an employer to contribute to a fringe-benefit plan, the employer must do so. 29 U.S.C. § 1145. The statute defines "employer" as "any person acting directly as an employer," ERISA § 3(5), 29 U.S.C. § 1002(5), and defines "person" to include a "joint venture." ERISA § 3(9), 29 U.S.C. § 1002(9). Therefore, CSI's obligation to remit contributions for work performed with Apex hinges on whether CSI and Apex were joint venturers.

Under Minnesota law, four requirements must be met to create a joint venture: (1) contribution by all parties; (2) joint proprietorship and control; (3) sharing of profits; and (4) a contract. *See Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 332 (Minn. 2004); *Trs. Graphic Commc'ns Int'l Union Upper Midwest Local 1-M Health and Welfare Plan v. Bjorkedal*, No. 04-CV-3371 (PJS/JJG), 2006 WL 3511767, at *8 (D. Minn. Dec. 6, 2006) (applying *Rosenberg*'s four-factor test to determine ERISA contribution obligations of alleged joint venturer), *aff'd*, 516 F.3d 719 (8th Cir. 2008). The work CSI and Apex did together for the London Road construction project satisfies this four-factor test. CSI contributed equipment, personnel, and wage-and-benefit money, while Apex contributed workers-compensation costs and provided bonding for the project. Young Dep. at 10-12. The two companies shared control, with Apex performing administrative tasks such as signing the government contract and handling paperwork for the project, while CSI provided day-to-day supervision on the site. Young Dep. at 10-12, 16. Apex and CSI agreed to share the profits of their work together, and when expenses

exceeded revenues they apportioned the losses between themselves. Young Dep. at 14, 20. All of these arrangements were part of CSI's verbal agreement with Apex. Because CSI and Apex acted as a joint venture, and because CSI was an alter ego of Arrowhead, Arrowhead was required to remit contributions for work done by Arrowhead/CSI employees as part of the joint venture, even though those employees were nominally placed on Apex's payroll.

In addition to its arrangements with other corporate entities, CSI further evaded its obligations under the CBA by designating various individuals as "subcontractors" when they were actually employees, an activity CSI's bookkeeper admits. Tr. Ex. P-41 at 752; Beckwith Dep. at 123-24.

In sum, the Funds have demonstrated that they are entitled to recover from Arrowhead and CSI for work performed by those entities, as well as by MWM, the CSI-Apex joint venture, and numerous individual employees misidentified as "subcontractors."

As for the amount of the judgment: The Funds contend they are entitled to $349,958.66 in unpaid fringe-benefit contributions, $83,980.00 in attorney's fees, and $17,835.70 in costs. Nissen Aff. at Ex. N. They also contend that they are entitled under § 502(g)(2)(A)-(C) of ERISA to the greater of (1) double the amount of pre-judgment interest on the unpaid contributions or (2) pre-judgment interest plus liquidated damages. Nissen Aff. at Ex. N; 29 U.S.C. § 1132(g)(2)(A)-(C). Based on the CBA, the Funds' liquidated damages are $34,995.87 (10% of the unpaid contributions), and the pre-judgment interest is $96,131.84. The Funds therefore seek double the amount of pre-judgment interest, or $192,263.68, because it is the greater amount.

Using records obtained from Arrowhead and CSI, the auditor calculated the total amounts of unpaid contributions and interest in accordance with ERISA and the terms of the CBA. Tr. Ex. P-73 (covering Arrowhead, CSI, and MWM); Tr. Ex. P-75 (covering purported CSI subcontractors); Tr. Ex. P-76 (covering Apex). Where defendants' records were inadequate to determine whether the work they described was covered by the CBA, the auditor treated the work as covered. The Court finds this practice appropriate in light of the fact that ERISA puts the burden on employers to maintain accurate records regarding contributions. ERISA § 209(a)(1), 29 U.S.C. § 1059(a)(1). *See Mich. Laborer's Health Care Fund v. Grimaldi Concrete Inc.*, 30 F.3d 692, 697 (6th Cir. 1994) (where an employer has not maintained adequate records, burden for showing whether work was covered by CBA shifts from plaintiff to employer); *Stanton v. Larry Fowler Trucking, Inc.*, 52 F.3d 723, 728 (8th Cir. 1995) (adopting a similar burden-shifting principle in the COBRA context and citing *Grimaldi* with approval). An employer should not be able to avoid his obligation to make payments under ERISA by avoiding his obligation to keep records under ERISA. The Court finds, based on the evidence submitted by the Funds, that the Funds are entitled to $349,958.66 in unpaid fringe-benefit contributions and to double pre-judgment interest in the amount of $192,263.68.

Both ERISA and the CBA contain fee-shifting provisions that permit the Funds to recover their attorney's fees and costs. Tr. Ex. P-17 at 524; ERISA § 502(g)(2)(D), 29 U.S.C. § 1132(g)(2)(D). The Court has reviewed the evidence submitted by the Funds in support of their request for attorney's fees and costs, and the Court finds that the amounts sought by the Funds — $83,980.00 in attorney's fees and $17,835.70 in costs — are reasonable given the duration and complexity of this litigation and the quality of the work of the Funds' attorneys.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion for entry of judgment [Docket No. 86] is GRANTED.

2. Defendants are jointly and severally liable to plaintiffs in the amount of $644,038.04.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 11, 2010         s/Patrick J. Schiltz
                       Patrick J. Schiltz
                       United States District Judge